IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REDBACK NETWORKS INC., | ) | Case No. 03-13359 (MFW) |
| | ) | |
| Debtor. | ) | |

## MOTION SEEKING ENTRY OF AN ORDER
### (1) SCHEDULING COMBINED HEARING TO CONSIDER
### (A) ADEQUACY OF DISCLOSURE STATEMENTS AND (B) CONFIRMATION
### OF PLAN OF REORGANIZATION; (2) ESTABLISHING
### OBJECTION DEADLINES; AND (3) APPROVING FORM OF NOTICE

The above-captioned debtor and debtor in possession (the "Debtor") files this

motion (the "Motion") seeking entry of an order: (1) scheduling a combined hearing to consider

(a) adequacy of the Debtor's: (i) Offer to Exchange 47,5000,000 post-reverse split shares of

Common Stock for $467,500,000 aggregate principal amount of 5% Convertible Subordinated

Notes due 2007 and related accrued interest and Disclosure Statement for Solicitation of

Acceptances to Prepackaged Plan of Reorganization; and (ii) Proxy/Prospectus/Disclosure

Statement, dated as of October 10, 2003 (collectively, the "Disclosure Statements")[1] and (b)

confirmation of the Debtor's Prepackaged Plan of Reorganization (the "Plan"); (2) establishing

objection deadlines; and (3) approving form of notice. In support of this Motion, the Debtor

respectfully states as follows:[2]

---

[1] As is described below, both Disclosure Statements contained substantially equivalent descriptions of the Debtor, its financial condition, the proposed bankruptcy proceedings and the Plan.

[2] The facts and circumstances supporting this Motion are set forth in the Affidavit of Thomas L. Cronan, III, Senior Vice President of Finance and Administration and Chief Financial Officer of Redback Networks, Inc., in support of First Day Motions.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (L) and (O).

2.      Venue in these cases and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105, 1125, 1126, 1127, 1128 and 1129 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3017, 3018, and 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.      On November 3, 2003 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5.      The Debtor continues in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6.      No trustee or examiner has been appointed, and no official committee of creditors or equity security holders has been appointed in the Debtor's Chapter 11 case.

## Summary of Operations

7.      The Debtor is a leading provider of advanced telecommunications networking equipment, based on worldwide market share by revenue for the Internet access and

infrastructure equipment segment. The Debtor's products enable carriers and service providers to deploy high-speed access and services to the Internet and corporate networks. The Debtor's product lines, which consist of the SMS™ family of subscriber management systems and the SmartEdge® product families, combine networking hardware and software. These product families are designed to enable the Debtor's customers to create end-to-end regional and national networks that support major broadband access technologies, as well as the new services that these high-speed connections support.

8.     The Debtor's SMS products connect and manage large numbers of subscribers across major high-speed access technologies, including DSL. SMS products bridge the operational gap between the devices used to gather high-speed Internet users (*i.e.*, access concentrators) at one end of the network and the devices at the other end of the network used to connect to the Internet (*i.e.*, routers). The Debtor has a full portfolio of products in the SMS family targeted for different scaling points in the network. These products include the SMS 500, SMS 1800, SMS 10000, and the SMS 10000 SL.

9.     The Debtor's SmartEdge products offer service providers the next generation of edge routers that afford the opportunity to generate revenue from value-added network services in addition to the data/Internet connectivity provided by traditional routers. The Debtor's SmartEdge products allow telecom carriers to build next generation broadband architecture, improving capacity, performance and costs in the delivery of Internet Protocol, or IP, services like Virtual Private Networks. The Debtor's SmartEdge platforms allow broadband service providers to connect thousands of consumer and business users quickly and cost-

effectively through a broad range of access technologies. The Debtor's modular and scalable IP software enables the platform to provide users with high reliability, scalability and performance. The Debtor announced its SmartEdge Router product during the fourth quarter of 2001 and its SmartEdge Service Gateway in the second quarter of 2003.

10.     The combination of the SMS and SmartEdge platforms deliver an architecture that enables the Debtor's carrier and service provider customers to build User Intelligent Networks,™ thereby creating a robust environment for inserting and managing differentiated IP Services, on a user-by-user basis.

11.     The Debtor's products currently are being used by many of the largest carriers and service providers worldwide, including: Verizon, BellSouth, SBC, Bell Canada, Sprint, Level 3, Williams Communications and the UUNET subsidiary of WorldCom in North America; Belgacom, British Telecom, France Telecom, Bezeq and Telia in the Europe, Middle East and Africa region; and Chughwa Telecom, Korea Telecom, Hanaro, eAccess, NTT and China Telecom in Asia.

12.     For the fiscal year ending December 31, 2002, the Debtor generated consolidated net revenues of $125.6 million and a net operating loss of $186.9 million. For the nine months ended September 30, 2003, the Debtor generated consolidated net revenue of $79.1 million and a net operating loss of $94.0 million. The Debtor currently has 488 full time employees, 8 contract employees and 6 interns.

## Facilities

13.     The Debtor's principal executive offices are located at 300 Holger Way, San Jose, California 95134. The Debtor leases office space in a number of locations, primarily for sales and administrative offices, totaling approximately 565,000 square feet of leased space.

## Equity and Significant Indebtedness

14.     As of September 26, 2003, 183,007,239 shares of the Debtor's common stock, par value $0.0001 per share, were issued and outstanding (or 213,056,988 shares on a fully diluted basis, assuming the exercise of options and warrants issued and outstanding). The Debtor's common stock is quoted on the Nasdaq National Market and is widely held. In addition, as of September 26, 2003, warrants to purchase approximately 136,140 shares of the Debtor's common stock are outstanding, and options to purchase approximately 30.0 million shares of its common stock are outstanding. The Debtor has authorized 10,000 shares of preferred stock at $0.0001 par value, none of which are issued or outstanding.

15.     In October 2002, the Debtor received notification from The Nasdaq Stock Market ("Nasdaq") that it was not in compliance with the minimum bid price requirement of $1.00 per share for its common stock and that the Debtor had 90 calendar days, or until January 13, 2003, to regain compliance. Nasdaq subsequently granted the Debtor additional extensions to regain compliance with the minimum bid price requirement. On October 15, 2003, the Debtor received a decision from the Nasdaq's Listing Qualifications Panel that allowed the Debtor to remain listed on The Nasdaq National Market until at least November 4, 2003, in order to enable the Debtor to secure stockholder approval of its proposed approximately 73.39:1 reverse stock

split. Although the Debtor did not secure stockholder approval of the reverse stock split prior to November 4, 2003, the Debtor intends to request that Nasdaq allow its common stock to remain listed during the pendency of its Chapter 11 case.

16. As of the Petition Date, the Debtor maintained a secured revolving facility (the "Revolving Secured Loan") with Silicon Valley Bank ("SVB") under that certain Loan and Security Agreement dated December 27, 2002 (the "Revolving Credit Agreement"). The Revolving Secured Loan consists of a revolving loan of up to $30 million, secured by restricted cash of the Debtor. The outstanding balance of the Revolving Secured Loan is zero, following the Debtor's payment of the outstanding $13 million balance of this obligation in October 2003. In addition, SVB and Wells Fargo Bank have issued certain letters of credit for the account of the Debtor to Jabil Circuits, Inc. and other third parties, in the undrawn amount of approximately $17,432,920 in the aggregate. The Debtor's obligation to reimburse SVB or Wells Fargo Bank for any draw on the letter of credit is secured by restricted cash of the Debtor.

17. In March 2000, the Debtor issued its 5.0% Convertible Subordinated Notes due April 1, 2007 in the aggregate original principal amount of $500.0 million (the "Convertible Subordinated Notes") pursuant to an Indenture dated March 29, 2000, as supplemented by the First Supplemental Indenture dated as of May 8, 2001 (the "Indenture") between the Debtor, as issuer, and Wells Fargo Bank Minnesota, National Association (formerly known as Norwest Bank Minnesota, National Association), as Indenture Trustee (the "Indenture Trustee"). The Debtor has not made the interest payments due in October and November due under the Convertible Subordinated Notes and the current accreted value of the Convertible

Subordinated Notes is approximately $481.2 million. The Convertible Subordinated Notes are subordinated in right and payment to the Debtor's present and future senior debt and are effectively subordinated in right of payment to all indebtedness and other obligations of the Debtor's subsidiaries. The Convertible Subordinated Notes are subject to redemption by the Debtor at the redemption prices set forth in the Indenture, provided that the Debtor may not redeem the Convertible Subordinated Notes before April 1, 2005, unless the closing price for the Debtor's common stock exceeds 140% of the conversion price of the Convertible Subordinated Notes, as adjusted, for at least 20 trading days within a period of 30 consecutive trading days ending within five trading days of the notice of redemption. In addition, the holders of the Convertible Subordinated Notes have the right to convert the Convertible Subordinated Notes to shares of the Debtor's common stock pursuant to the terms of the Indenture and the Convertible Subordinated Notes, and have the right, upon a change in control of the Debtor, to require the Debtor to repurchase some or all of the Convertible Subordinated Notes, at a price equal to 100% of the principal amount plus accrued interest, payable in cash or at the Debtor's option depending on the circumstances, shares of the Debtor's common stock.

### Factors Leading to the Solicitation of the Debtor's
### Prepackaged Plan and Commencement of the Debtor's Chapter 11 Case

18.     Since its inception, the Debtor has funded its business primarily through the issuance of debt and equity securities. The Debtor has generated substantial revenue since its inception, but to date, has not been profitable. From its inception on August 30, 1996 through September 30, 2003, the Debtor has generated revenues of approximately $783.8 million and net losses of approximately $5.4 billion. The attractiveness of the Debtor's products and services to

its customers and potential customers and the confidence of the Debtor's suppliers in the Debtor have been impaired by the Debtor's financial condition. The Debtor's financial condition has negatively affected its appeal to potential lenders and investors. Further, many of the Debtor's vendors, customers and others upon which the Debtor depends have had unfavorable experiences in their dealings with distressed companies in the current industry downturn and have suffered as a result of the market conditions that have ravaged the telecommunications industry. The Debtor is highly dependent on sales to companies in the telecommunications sector, which sector has been depressed over the last two years.

19.     In response to these financial challenges, the Debtor recently has implemented aggressive cost cutting measures, including consolidation of its San Jose operations from two buildings to one during the second quarter of 2003, the surrender of approximately 147,000 square feet of office space in Canada, and a 27% reduction in workforce, while diligently investigating and pursuing their strategic alternatives. In 2002, in light of the financial crisis facing the Debtor, the Debtor commenced an intensive consideration of a possible recapitalization, and engaged counsel, financial consultants and investment bankers to assist it in this regard.

### The Prepetition Solicitation

20.     In late 2002, the Debtor was informed that certain holders of the Convertible Subordinated Notes had formed an informal committee, and in January 2003 the Debtor and the informal committee began to negotiate a possible financial restructuring of the Debtor. These negotiations produced a number of different proposals and counterproposals

made by the Debtor and the informal committee of noteholders, culminating in an exchange offer recapitalization proposal that provided, among other things, for: (a) the exchange of the Convertible Subordinated Notes for 95% of the outstanding common stock of the Debtor, with existing stockholders retaining 5% of the equity in the Debtor; (b) a minimum tender condition of 98% of the aggregate principal amount of the Convertible Subordinated Notes; (c) an 18% equity incentive pool for employees and management (the dilution from which would be borne equally by all stakeholders of the recapitalized Debtor); (d) the issuance to existing stockholders of warrants to purchase 5% of the fully diluted common stock at an exercise price based on an enterprise value of $250 million and a second series of warrants to purchase an additional 5% of the fully diluted common stock at an exercise price based on an enterprise value of $500 million; and (e) the contemporaneous solicitation by the Debtor's creditors and equity holders of a pre-packaged plan of reorganization under Chapter 11 of the Bankruptcy Code that would be filed under certain circumstances.

21.     In June 2003, the Debtor's Board of Directors engaged a financial advisor to evaluate the fairness, from a financial point of view, of the recapitalization plan to existing stockholders. On June 15, 2003, the financial advisor issued its opinion to the Board of Directors that the proposed recapitalization plan was fair to the Debtor's existing stockholders from a financial point of view. After further discussion, the Debtor's Board of Directors determined that the proposed restructuring transaction was in the best interests of the Debtor, approved and adopted the proposed restructuring transaction, and authorized management to continue to negotiate and conclude a lock-up agreement with holders of Convertible

Subordinated Notes representing 66-2/3% of the aggregate principal amount of the outstanding Convertible Subordinated Notes.

22.     In May, June and July 2003, the Debtor and the informal committee of noteholders negotiated a lock-up agreement relating to the Debtor's proposed financial restructuring. The Debtor and holders of Convertible Subordinated Notes representing approximately 67% of the aggregate principal amount of notes outstanding executed the Lock-Up Agreement as of July 6, 2003 (the "Lock-Up Agreement").

23.     On August 6, 2003 the Debtor filed a preliminary Prospectus and Disclosure Statement (the "Prospectus and Disclosure Statement") on Form S-4 (SEC Registration Number 333-107714) with the Securities and Exchange Commission ("SEC"). In accordance with SEC's procedures this preliminary Prospectus and Disclosure Statement and all subsequent amendments were available over the Internet publicly through the SEC's EDGAR system. The Prospectus and Disclosure Statement combined both the prospectus for the proposed out of court exchange offer for Subordinated Convertible Notes and the disclosure statement relating to the proposed prepackaged plan of reorganization. The Prospectus and Disclosure Statement contains detailed descriptions of the Debtor and its financial condition and a description of classes and treatment of claims and interests under the Plan of Reorganization (the "Plan") and other principal features of the Plan and Chapter 11 proceedings, together with a copy of the Plan itself. On August 22, 2003 the Debtor also filed a preliminary Prospectus, Proxy Statement and Disclosure Statement (the "Prospectus, Proxy Statement and Disclosure Statement") on Form S-4 (SEC Registration Number 333-108170) with the SEC. The

Prospectus, Proxy Statement and Disclosure Statement combined both the prospectus for the out of court recapitalization plan proposals to be submitted to the Debtor's stockholders and the disclosure statement relating to the proposed prepackaged plan of reorganization. This Prospectus, Proxy Statement and Disclosure Statement (and subsequent amendments) similarly was available publicly over the Internet through the SEC's EDGAR system. Throughout August September and October 2003, the Debtor received and responded to comments from the SEC on the two registration statements.

24.     In September 2003, after it became apparent that the exchange offer could not be launched in time to be concluded by the original September 30, 2003 deadline anticipated by the Lock-Up Agreement, the Debtor and the informal committee of noteholders negotiated an amendment to the Lock-Up Agreement. The amendment, among other things, extended the deadline for concluding the exchange offer to October 31, 2003. However, a condition of the extension was that the Debtor also had to commit that, if the exchange offer was not successfully concluded by October 31, 2003, then the Debtor would seek to pursue a bankruptcy reorganization alternative and to file a Chapter 11 bankruptcy petition by November 3, 2003.

25.     At the beginning of October, after the registration statements were declared effective by the SEC, the Debtor commenced a solicitation process in advance of the filing of its bankruptcy petition and at the same time launched the exchange offer with respect to its out-of-court restructuring plan. An initial distribution of the preliminary Prospectus and Disclosure Statement and preliminary Prospectus, Proxy Statement and Disclosure Statement was mailed or couriered to approximately 213 holders of impaired claims and approximately

95,000 holders of impaired equity interests, respectively, commencing on October 2 together, where possible, with a form of ballot for voting upon the Plan of Reorganization. Both registration statements contained substantially equivalent and detailed descriptions of the Debtor, its financial condition and the proposed prepackaged bankruptcy proceedings and the Plan of Reorganization. Under SEC regulations, the holders of the Debtor's Subordinated Convertible Notes and its equity interest holders could not receive a ballot until the registration statements were declared effective. Once the SEC had declared the registration statements effective on October 10, 2003, a second mailing was commenced to the impaired claim and equity interest holders with the respective definitive form of prospectus together, in the case of the noteholders and the holders of certain other impaired claims and the holders of equity interest holders, with a ballot for voting on the Plan of Reorganization. During the period since the mailing of the definitive prospectuses the Debtor, its ballot agent and financial adviser sought to contact beneficial owners of impaired claim and equity interests to confirm that they have received the solicitation packages. Since many of the claims or equity interests were held in 'street name' the identity of beneficial owners was not always available to the Debtor or its agents. In such cases the Debtor worked through the brokers and other registered intermediary holders to ensure that the solicitation materials were made available to the beneficial owners.

26. The tender offer for the exchange of the Debtor's Subordinated Convertible Notes and the prepetition solicitation period for the Plan expired at midnight on October 30, 2003. By the end of the tender offer period it was apparent that the 98% minimum tender condition, and certain other conditions, to the exchange offer could not be satisfied.

However, the Debtor believed that it had received sufficient acceptances of its Plan required to pursue confirmation of the Plan on a prepackaged basis. Accordingly, having considered the alternatives available, including pursuing a non-prepackaged bankruptcy proceeding, and in light of the obligations of the Debtor under the Lock-Up Agreement, on November 3, 2003 the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and commenced this bankruptcy proceeding.

27.     The Debtor has filed its Plan and disclosure statement contemporaneously with the filing of its Chapter 11 bankruptcy petition on the Petition Date. The Plan, which the Debtor has negotiated with the informal committee of holders of its Convertible Subordinated Notes and other creditors as set forth above prior to the Petition Date, provides for, among other things: (i) the exchange of all of the Debtor's outstanding Convertible Subordinated Notes for 47.5 million (approximately 92.1%) of the newly issued shares of common stock par value $0.0001 in the Debtor (the "New Common Stock"); (ii) the issuance of approximately 1.6 million additional shares (approximately 3.0%) of the New Common Stock to the holders of other allowed general other unsecured claims in payment of their claims against the Debtor; (iii) the exchange of all of the Debtor's issued and outstanding existing common stock and above market warrants and options for 2.5 million (approximately 4.8%) shares of the New Common Stock in the Debtor, and for warrants exercisable for approximately 5.4 million shares of New Common Stock (having an exercise price of $5.00 per share with respect to approximately 2.6 million shares of New Common Stock and $9.50 per share with respect to approximately 2.8 million shares of New Common Stock), to the holders of the Debtor's existing common stock of

record; (iv) for an approximately 73.39:1 reverse stock split of the Debtor's existing common stock; and (v) for the reservation of approximately 12.5 million shares of common stock for issuance to management and other employees under the Debtor's 1999 Retained Incentive Plans. The Debtor's Board of Directors and management believe that Chapter 11 and the proposed recapitalization pursuant to the prepackaged bankruptcy plan provides the best opportunity to preserve and enhance the Debtor's enterprise value, assure continued service to the Debtor's customers, and permit the orderly financial restructuring and reorganization of the Debtor.

The Plan has been overwhelmingly supported by the Debtor's creditors. The Debtor intends to seek Plan confirmation expeditiously.

28.     The Debtor believes it has obtained the requisite votes to confirm the Plan from the Holders of claims or interests entitled to vote on the Plan and, accordingly, the Debtor intend to proceed towards swift confirmation of the Plan.

## Summary of Relief Requested

29.     By this Motion, the Debtor respectfully requests entry of an order (the "Scheduling Order"):

(a) scheduling a combined hearing (the "Disclosure Statement and Confirmation Hearing") to consider (1) adequacy of the Disclosure Statements and (2) confirmation of the Plan in accordance with section 1127 of the Bankruptcy Code;

(b) waiving the local rule requirements under Del. Bankr. L.R. 3017-1(b) which requires that the plan proponent timely file a motion for approval of voting procedures, including

the form of ballots, the voting agent, and the time and manner of voting ("Local Rule 3017-1(b)");

(c) establishing objection deadlines for the Disclosure Statement and Confirmation Hearing; and

(d) approving the form of notice, substantially in the form attached hereto as Exhibit A, relating to the commencement of this Chapter 11 Case, and deadlines established by this Court, and the Disclosure Statement and Confirmation Hearing.

## Relief Requested

**A.    Scheduling a Combined Hearing to Consider (1) Adequacy of the Debtor's Disclosure Statements and (2) Confirmation of the Plan**

### i.    Adequacy of the Debtor's Disclosure Statements

30.    Bankruptcy Rules 3017(a), 3018(b) and section 1126 of the Bankruptcy

Code govern the approval of disclosure statements disseminated in connection with prepackaged

chapter 11 cases. In particular Bankruptcy Rule 3017(a) provides, in relevant part, as follows:

> Except as provided in Rule 3017.1, after a disclosure statement is filed in accordance with Rule 3016(b), the court shall hold a hearing on at least 25 days' notice to the debtor, creditors, equity security holders and other parties in interest as provided in Rule 2002 to consider the disclosure statement and any objections or modifications thereto. The plan and the disclosure statement shall be mailed with the notice of the hearing only to the debtor, any trustee or committee appointed under the Code, the Securities and Exchange Commission and any party in interest who requests in writing a copy of the statement or plan. Objections to the disclosure statement shall be filed and served on the debtor, the trustee, any committee appointed under the Code, and any other entity designated by the court, at any time before the disclosure statement is approved or by an earlier date as the court may fix.

31.     Section 1126(b) of the Bankruptcy Code provides as follows:

(b)     For the purposes of subsections (c) and (d) of this section, a holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if —

(1)     the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or

(2)     if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

32.     Bankruptcy Rule 3018(b) provides, in relevant part, as follows:

A holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with § 1126(b) of the Code.

33.     The Disclosure Statements were initially mailed to all holders of impaired claims or the nominees for the Convertible Subordinated Notes and equity holders entitled to vote on the Plan commencing on or about October 2, 2003. Subsequently, after the SEC declared the documents effective, the final Disclosure Statements (which reflected certain amendments to the original forms) and ballots for voting on the Plan were mailed commencing on October 10, 2003. The Debtor established September 26, 2003, as the voting record date

(the "Voting Record Date") for the solicitation of acceptances and rejections to the Plan. The voting period ended at 12:00 midnight prevailing Eastern Time on October 30, 2003.

34. The Debtor respectfully submits that:

(e) the Disclosure Statements and the solicitation procedures instituted in connection therewith are in full compliance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules as well as any applicable nonbankruptcy laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation;

(f) the Disclosure Statements contain adequate information to permit holders of impaired claims against and equity interests in the Debtor to make an informed judgment about the Plan pursuant to sections 1125(a) and 1126(b)(2) of the Bankruptcy Code; and

(g) the Debtor's solicitation of acceptance of the Plan complied with all requirements of Bankruptcy Rule 3018.

35. At the Disclosure Statement and Confirmation Hearing, the Debtor will seek entry of an order:

(a) finding that the information contained in the Disclosure Statements is "adequate information" as such term is defined in section 1125(a)(1) of the Bankruptcy Code;

(b) waiving Local Rule 3017-1(b);

(c) approving the Disclosure Statements; and

(d) granting such other and further relief as the Court may deem just and proper.

## ii.    Confirmation of the Plan

36.    The scheduling of a plan confirmation hearing is governed by section 1128(a) of the Bankruptcy Code and Bankruptcy Rule 3017(c). In particular, section 1128(a) of the Bankruptcy Code provides that "[a]fter notice, the court shall hold a hearing on confirmation of a plan." Further, Bankruptcy Rule 3017(c) provides:

> On or before approval of the disclosure statement, the court shall fix a time within which the holders of claims and interests may accept or reject the plan and may fix a date for the hearing on confirmation.

37.    The table below summarizes the classes under the Plan:

| Class | Type of Claim or Interest | Entitled to Vote |
|-------|---------------------------|------------------|
| 1 | Other Priority Claims | No; deemed to accept |
| 2 | Secured Reimbursement Claims | No; deemed to accept |
| 3 | Other Secured Claims | No; deemed to accept |
| 4 | Unassumed Unsecured Claims | Yes |
| 5 | Jabil Claims | Yes |
| 6 | Assumed Unsecured | No; deemed to accept |
| 7 | Redback Preferred Stock Interests | No; deemed to accept |
| 8 | Old Redback Common Stock Related Interests | Yes |
| 9 | Below Market Warrant Interests | No; deemed to reject |
| 10 | Below Market Option Interests | No; deemed to reject |
| 11 | Securities Litigation Claims | No; deemed to accept |
| 12 | Employment Related Litigation Claims | Yes[3] |

38.    Before the Petition Date, the Debtor received executed ballots from the impaired classes of creditors entitled to vote on the Plan reflecting that each impaired class entitled to vote his voted to accept the Plan pursuant to section 1126 of the Bankruptcy Code.

---

[3] There are no creditors in this Class.

The Debtor believes that such acceptances are sufficient under sections 1126(b), (c) and (d) and section 1129 of the Bankruptcy Code to confirm the Plan.

### iii.    Combined Hearing

39.    The Debtor requests that this Court schedule the Disclosure Statement and Confirmation Hearing approximately forty-four (44) days after the Petition Date, on December 17, 2003, or as soon thereafter as the Court's schedule permits, to consider the adequacy of the Disclosure Statements and confirmation of the Plan. Once set, the Disclosure Statements and Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise without further notice to parties in interest.

40.    Because the Plan was accepted by each impaired class of creditors entitled to vote thereon (excluding Class 12 which contains no creditors), there is no reason to delay consideration of the Disclosure Statements, the solicitation procedures, and the Plan. Furthermore, because the most sensitive and complex tasks required to effectuate a successful reorganization have been accomplished in advance of the commencement of this Chapter 11 Case (i.e., negotiations of consensual agreement with the Debtor's bondholders), the circumstances weigh heavily in favor of scheduling the Disclosure Statement and Confirmation Hearing for the earliest date convenient to the Court.

41.    The Debtor further submits that the proposed Scheduling Order is in the best interests of all parties in interest in this Chapter 11 Case. In addition to the reasons set forth above, it is appropriate that a Scheduling Order be entered at this time in order that creditors and equity security holders may be informed as promptly as possible of the anticipated scheduling of

events preceding confirmation of the Plan. The proposed schedule affords creditors and equity security holders ample notice of the proceedings. Furthermore, at a minimum, each of the impaired parties in interest will have had the Disclosure Statements, in their original form, for more than 60 days before the proposed deadline for objections, and the final SEC approved versions for more than 50 days, and all other parties in interest will have notice and an opportunity to obtain a copy of the Plan and Disclosure Statement almost four weeks prior to the proposed deadline for objections. This allows more than ample time for parties to evaluate the Disclosure Statements and the Plan prior to the proposed hearing such that no party in interest will be prejudiced by the relief requested herein.

**B.    Objection Deadline**

42.     The Debtor requests that this Court establish an objection deadline (the "Objection Deadline") that is at least seven (7) business days before the Disclosure Statement and Confirmation Hearing as the last day for filing and serving objections to (i) the adequacy of the Disclosure Statements and (ii) the confirmation of the Plan.

43.     The Debtor also proposes that this Court require all objections to the Disclosure Statements and/or the Plan to be filed with the Court and served in a manner so as to be actually received on or before 4:00 p.m. prevailing Eastern Time on December 8, 2003 (the "Objection Deadline") by each of the following: (i) Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., counsel for the Debtor, 919 North Market Street, 16th Floor, P.O. Box 8705, Wilmington, DE 19899-8705, Attn: Laura Davis Jones, Esquire; (ii) Morgan, Lewis, Bockius LLP, counsel for the Debtors, One Market Street, Spear Street Tower, San Francisco, CA

94105, Attn: G. Larry Engel, Esquire; and (iii) the Office of the United States Trustee, 844 N. King Street, Wilmington DE 19801.

44.     The Debtor further requests that the Court (i) consider only timely filed and served written objections, (ii) require all objections to state with particularity the grounds for such objection, and in the case of an objection to the adequacy of the Disclosure Statements, provide the specific text of the disclosure which the objecting party believes to be appropriate, and (iii) overrule all objections not timely filed and served in accordance with the provisions of this Motion.

## C.     Form and Manner of Notices

45.     The Debtor requests approval of the notice substantially in the form attached hereto as Exhibit A (the "Notice"). Upon the entry of an order granting this Motion, the Debtor will serve the Notice on the parties listed below.

46.     The Notice shall contain, inter alia: (i) the date, time and place of the Disclosure Statement and Confirmation Hearing; (ii) instructions for obtaining copies of the Plan and Disclosure Statements; (iii) the deadline for filing objections to the adequacy of the Disclosure Statements and to confirmation of the Plan; (iv) notice of the commencement of this Chapter 11 Case; (v) notice of the automatic stay; and (vi) notice of the section 341 meeting of creditors (if such date has been selected by the United States Trustee by the time that the Notice is distributed). The Notice shall be given, via First Class Mail, to the following:

      (a)     The Indenture Trustee for the Convertible Subordinated Notes;

      (b)     Counsel to the informal noteholders committee;

(c)        Holders of Convertible Subordinated Notes;

(d)        Other known general unsecured creditors in Class 4;

(e)        Holders of Equity Interests in the Debtor;

(f)        The Internal Revenue Service;

(g)        The Securities and Exchange Commission;

(h)        The taxing authorities in any jurisdiction where the Debtor transact

business; and

(i)        all parties having requested notice pursuant to Bankruptcy

Rule 2002.

## Notice

47.     Notice of the Motion has been given to (a) the Office of the United States Trustee; (b) counsel to the Debtor's proposed postpetition lenders; and (c) counsel to the informal noteholders committee. As the Motion is seeking "first day" relief, notice of the Motion and any order entered respecting the Motion will be served as required by Del.Bankr.L.R. 9013-2(d). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, (1) scheduling a combined hearing to consider (a) adequacy of the Disclosure Statements and (b) confirmation of the Plan; (2) establishing objection deadlines; (3) approving form of notice; and (4) granting such further relief as is just and proper.

Dated: __11|3__ , 2003

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (Bar No. 3583)
Sandra G. McLamb (Bar No. 4283)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

– and –

MORGAN, LEWIS & BOCKIUS LLP
G. Larry Engel
Jonathan N.P. Gilliland
James J. Hoover
One Market
Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

[Proposed] Co-Counsel for Redback Networks, Inc.
Debtor and Debtor In Possession